IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ALICE WHITE and DERRICK WHITE, | ) ) | No. CV-F-05-1558 OWW |
| | ) ) ) | MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART |
| Plaintiffs, | ) ) ) | DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OR SUMMARY |
| vs. | ) ) | ADJUDICATION OF ISSUES (Doc. 30) |
| | ) ) | |
| CITY OF FRESNO, et al., | ) ) | |
| | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

Plaintiffs Alice White and Derrick White, each proceeding *in pro per,* have filed an Amended Verified Complaint.  Defendants are the City of Fresno, the Fresno Police Department, Sergeant Chastain, Officer Paley, Officer Rendon, Officer Dooms [sic], Officer Russian, Officer Harrell, Officer Manfredi, Officer Desmond, Officer Flores, and Officer Lopez.

Defendants move for summary judgment or summary adjudication.

A.   <u>PROCEDURAL ISSUES</u>.

Several procedural issues or matters that need correction or clarification.

Plaintiff Alice White, proceeding *in pro per,* commenced this action against the City of Fresno on May 3, 2005 in the Fresno

1

County Superior Court.  The action was removed to this Court on December 7, 2005 because the Complaint alleged violation of rights under the federal civil rights laws.  Her case was assigned Case No. CV-F-05-1558 OWW/LJO.  A Scheduling Order was filed on May 4, 2006.  Pursuant to the Scheduling Order, the discovery cut-off was April 17, 2007, non-dispositive motion cut-off was May 1, 2007, and dispositive motion cut-off was May 14, 2007.

Derrick White, proceeding *in pro per*, filed a Complaint in the Fresno County Superior Court on May 3, 2005 against the City of Fresno.  The action was removed to this Court on December 7, 2005 because the Complaint alleged violations of federal civil rights acts; it was assigned Case No. CV-F-05-1564 REC/WMM.  A Scheduling Order was filed on February 23, 2006.  On February 28, 2006, Defendants filed a notice of related case, stating that the case was related to No. CV-F-05-1558 OWW/LJO.  By Order filed on March 3, 2006, the case was related and reassigned to OWW/LJO, the same designation as in Alice White's action.  The cases were never ordered consolidated.  On March 16, 2006, a minute order setting a scheduling conference for April 28, 2006 was issued.  Defendants filed a scheduling report but Derrick White did not.  No scheduling order was ever issued.

On May 31, 2006, an Amended Complaint was filed in No. CV-F-05-1558, naming as plaintiffs Alice White and Derrick White, both proceeding *in pro per.*

On May 11, 2007, Defendants filed a motion for summary

2

judgment against both Plaintiffs, noticing the motion for hearing on June 18, 2007.  By minute order filed on June 1, 2007, the hearing on the motion for summary judgment was continued to July 2, 2007.

On June 25, 2007, plaintiffs Alice White and Derrick White filed oppositions to the motion for summary judgment.  Alice White's opposition was filed in No. CV-F-05-1558 and Derrick White's was filed in No. CV-F-05-1564 and was unsigned.

By Order filed on June 28, 2007, the hearing on the motion for summary judgment was continued from July 2 to August 20, 2007 because the Plaintiffs' oppositions were not timely filed as required by Rule 78-230(c), Local Rules of Practice, and because neither  opposition complied with the requirements of Rule 56-260(b), Local Rules of Practice.  The Order quoted the requirements of Rule 56-260(b) and further stated:

> Plaintiffs shall submit their respective oppositions to the motion for summary judgment in compliance with Rule 56-260(b), Local Rules of Practice, on or before Monday, July 23, 2007.  If not timely filed and in compliance with Rule 56-260(b), Plaintiffs' oppositions will be disregarded for purposes of resolving Defendants' motion for summary judgment.  No further failure to comply with the Local Rules of Practice or the Federal Rules of Civil Procedure will be accommodated.

On July 20, 2007, Alice White filed her opposition to the motion for summary judgment in No. CV-F-05-1558.  Derrick White's opposition, which is signed by him, was filed on July 20, 2007 in No. CV-F-05-1564.

1    Plaintiffs' respective oppositions were timely filed as

2  required by the June 28, 2007 Order.  However, neither opposition

3  complies with Rule 56-260(b).  Rule 56-260(b) provides:

4              Any party opposing a motion for summary
                judgment or summary adjudication shall
5              reproduce the itemized facts in the Statement
                of Undisputed Facts and admit those facts
6              that are undisputed and deny those that are
                disputed, including with each denial a
7              citation to the particular portions of any
                pleading, affidavit, deposition,
8              interrogatory answer, admission or other
                document relied upon in support of that
9              denial.  The opposing party may also file a
                concise 'Statement of Undisputed Facts,' and
10             the source thereof in the record, of all
                additional material facts as to which there
11             is a genuine issue precluding summary
                judgment or adjudication.  The opposing party
12             shall be responsible for the filing with the
                Clerk of all evidentiary documents cited in
13             the opposing papers.  See L.R. 5-133(j).  If
                a need for discovery is asserted as a basis
14             for denial of the motion, the party opposing
                the motion shall provide a specification of
15             the particular facts on which discovery is to
                be had or the issues on which discovery is
16             necessary.

17 Instead of reproducing Defendants' Statement of Undisputed

18 Material Facts and admitting or denying those separate facts and

19 including with each denial a citation to the particular portions

20 of any pleading, affidavit, deposition, interrogatory answer,

21 admission or other document relied upon in support of that

22 denial, Plaintiffs have referenced the narrative description of

23 undisputed material facts set forth in Defendants' memorandum of

24 points and authorities and admitted or denied various pages,

25 paragraphs and/or lines in the memorandum of points and

26 authorities.  For instance, each opposition states that "[t]he

4

Plaintiff's denies [sic] based upon the lack of sufficient information to the first seven paragraphs of section two of the Defendant's Undisputed Material Facts on page 2 and 3" and that "[t]he Plaintiffs denies [sic] based upon lack of sufficient information to the last paragraph on page 3 in the Undisputed Material Facts; except for the first two lines of that paragraph on line number 25 and 26." Further, Plaintiffs' oppositions do not submit any evidentiary documents. The June 28, 2007 Order specifically cited and quoted *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir.2001):

> [T]he district court may determine whether there is a genuine issue of material fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers. Though the court has discretion in appropriate circumstances to consider other materials, it need not do so. The district court need not examine the entire file for evidence establishing a genuine issue of material fact, where the evidence is not set forth in the opposing papers with adequate references to that it could conveniently be found.

Although Defendants note Plaintiffs' failures to comply with Rule 56-260(b), they attempt to extrapolate from Plaintiffs' oppositions those aspects of the Statement of Undisputed Material Facts which are admitted, or denied with insufficient legal or factual basis. It is apparent from page and line references that Defendants are referring to Plaintiffs' oppositions filed on June 25, 2007, which did not comply with Rule 56-260(b) and not to the oppositions filed on July 20, 2007. Because

Defendants refer to the June 25, 2007 oppositions instead of the July 20, 2007 oppositions, there are instances where Defendants contend that facts are admitted because of Plaintiffs' failure to respond when, in the July 20, 2007 oppositions, Plaintiffs purport to dispute certain facts, albeit without reference to any admissible evidence.  These chaotic conditions have grossly and unnecessarily multiplied the work of the Court.

At the hearing on August 20, 2007 and again at the hearing on September 24, 2007 , Alice asserted that counsel for Defendants had the "discovery" and did not provide it to her until "recently."  The "discovery" to which Alice referred is the "discovery" (evidence) developed in connection with the criminal investigations and prosecutions of Alice and Derrick White. Plaintiffs provide no showing that either of them propounded any discovery to Defendants in these civil actions pursuant to the Federal Rules of Civil Procedure.

B.   GOVERNING STANDARDS.

Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).  Materiality is determined by the substantive law governing a claim or a defense.  *Id*.  The evidence and all

inferences drawn from it must be construed in the light most favorable to the nonmoving party.  *Id.*

Even though neither Plaintiff has filed an opposition to Defendants' motion as required by Rule 56-260, Local Rules of Practice, summary judgment may not be granted on that ground alone.  *See Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950 (9th Cir.1993).  The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the non-moving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  *T.W. Elec.*, 809 F.2d at 630.  The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific facts showing there is a genuine issue for trial."  *Id.*  The nonmoving party may not simply state that it will discredit the moving party's evidence at trial; it must produce at least some "significant probative evidence tending to support the complaint."  *Id.*  A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence.  *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir.2000).  As explained in *Carmen v. San Francisco Unified School District*, *supra*, 237 F.3d at 1031:

> [T]he district court may determine whether there is a genuine issue of material fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers.  Though the court has discretion in appropriate circumstances to consider other materials, it need not do so.  The district court need not examine the entire file for evidence establishing a genuine issue of material fact, where the evidence is not set forth in the opposing papers with adequate references to that it could conveniently be found.

The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995).  This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id.* The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id.*

C.   **DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS.**

<u>UMF 1</u>: On Monday, March 15, 2004, at 8:19 p.m., Fresno Police Department Officers Rendon and Paley were dispatched to the Arco service station at 4210 E. Butler where a robbery had just occurred.  The person who committed the robbery was described as a black male wearing a mask, a black leather jacket and possessing an unknown weapon.  The person suspected of

committing the robbery had last been seen heading towards Hanoian's Market, in the same shopping center as the Arco station.  Officers Rendon and Paley arrived at the scene at 8:23 p.m.

In the section of Plaintiffs' oppositions purportedly responding to the Statement of Undisputed Facts, they state that they deny this fact based upon lack of sufficient information. However, Plaintiffs' oppositions later state that "officers Peterka and Lopez were the first to respond to the scene of the robbery, not Rendons or Paley" and that "there was never an accurate description given of the suspect 'or' of his face 'nor' was the plaintiff ever identified by the victim."  No evidentiary support is referenced for these statements and it is irrelevant who first responded.

These facts are undisputed.

UMF 2: Upon arrival at the scene, Officer Rendon identified David Dy, a clerk at the Arco station, as the victim of the robbery.

Plaintiffs' opposition states that they deny this fact based upon lack of sufficient information.  Therefore, the fact is undisputed as information and belief denial is insufficient to overcome admissible evidence to the contrary.

UMF 3: Mr. Dy was working to 2:00 p.m. to 10:30 p.m. shift on March 15, 2004.  Between 8:00 p.m. and 8:30 p.m., Mr. Dy stepped outside his booth to have a cigarette and clean up.  When he was doing so, a black male walked up with his head down and

asked for a pack of Newports.

Plaintiffs' oppositions state that they deny this fact based on lack of sufficient information.  This fact is undisputed as Plaintiffs have no contrary evidence.

**UMF 4**: When Mr. Dy went into the booth to get the Newports, the door to the booth did not shut entirely.  The black male opened the door and walked up to Mr. Dy holding a handgun and said, "Give me the money".

Plaintiffs' oppositions state that they deny this fact based on lack of sufficient information.  This fact is undisputed as Plaintiffs have no contrary evidence.

**UMF 5**: After Mr. Dy gave the money and the cigarettes to the black male, the black male told Mr. Dy to get on the floor, spread his arms open and not get up.  The black male told Mr. Dy, "Get down on the floor or I'll shoot."  Mr. Dy complied.  After about 10 seconds, Mr. Dy got up and saw the black male running southeast towards the laundromat.

Plaintiffs' oppositions state that they deny this fact based on lack of sufficient information.  This fact is undisputed as Plaintiffs have no contrary evidence.

**UMF 6**: Mr. Dy described the handgun to Officer Rendon as being a longer barreled automatic, possibly a 9 mm., which was square shaped and silver in color.[1]  Mr. Dy told Officer Rendon

---

[1]Officer Rendon's declaration avers that Mr. Dy told him that the handgun was silver in color.  However, at the preliminary hearing for Derrick White, Mr. Dy testified that the handgun was black.

that the handgun looked like Officer Rendon's .40 caliber but was slightly longer in the barrel, that it did not look like a revolver, and that he knew it was an automatic.

The section of Plaintiffs' oppositions captioned "Defense" they assert: "[T]he victim David Dy never seen a weapon as stated in the 911 dispatch report ... The victim David Dy never tried to describe different types of guns until her come in contact with the officers in this case."

Plaintiffs' assertions are unsupported by reference to any witness with personal knowledge. This fact is undisputed.

**UMF 7**: Mr. Dy described the suspect as wearing a black leather jacket, dark pants, and dark gloves. He also described the suspect as wearing a mask but he could see his eyes and lips.

**UMF 8**: Mr. Dy described the suspect to Officer Rendon as a black male, approximately 160 to 180 pounds, six feet tall, with black hair and brown eyes, a thin to medium build, with a slight mustache possibly two days old in growth. Mr. Dy told Officer Rendon that the suspect had a medium complexion and looked to be 25 to 30 years old.

In Plaintiffs' July 20 oppositions, they deny this fact based on lack of sufficient information. This fact is undisputed as Plaintiffs have no contrary evidence.

**UMF 9**: At the scene, Officer Paley questioned Apolonio Delgado. Mr. Delgado told Officer Paley that he was pumping gas at the Arco station when he saw a black male walk toward the Arco cashier's booth. The black male then approached the cashier who

11

was standing outside the booth, started talking to the cashier, put something to the cashier's side and walked him into the booth.  Mr. Delgado told Officer Paley that he did not pay much attention until the black male ran away from the Arco station.

In their July 20 oppositions, Plaintiffs deny this fact based on lack of sufficient information.  Therefore, this fact is undisputed because Plaintiffs have no contrary evidence.

UMF 10: Mr. Delgado told Officer Paley that the suspect was a black male, approximately 5'8", between his 20's and 30's.  Mr. Delgado noticed that the black male was wearing a black leather jacket and a ski mask.  As Mr. Delgado watched the black male run away, he saw him take off the jacket and that he was wearing a white T-shirt.[2]

In Plaintiffs' oppositions to the Statement of Undisputed Fact, Plaintiffs deny these facts for lack of sufficient information.  However, in the portions of their oppositions captioned "Defense", Plaintiffs assert:

> The only real witness who was actually able to give a somewhat accurate description was 'Apolinio Delgado' and he already told the Police, the D.A. and Plaintiff's investigators that he was sure the Plaintiff ... was not the suspect he saw on the night of March 15th, 2004.  In-truth [sic], Delgado statement [sic] that officers Paley and Rendon filed in there [sic] report was

_____

[2]UMF 10 also states that Mr. Delgado said that the black male walked toward a large tree on the east side of the parking lot and took off the black jacket.  However, the testimony at Derrick White's preliminary hearing cited as evidence, only states that the black male ran east from the Arco station towards the laundromat and a big palm tree.

incomplete and was intentionally misleading
because Aplinios [sic] Delgado had a lot more
to say about the night in question.

Defendants object to this statement in Plaintiffs'
oppositions:

The Plaintiff's [sic] use of the word
'Plaintiff' to refer to Plaintiff not being
suspect, is vague and confusing.  It is
believed the Plaintiff meant 'suspect.'
Plaintiff's [sic] response improperly
concludes, and opines that Mr. Delgado is the
*only* witness who was able to provide an
accurate description of the suspect without
providing a foundation for [their]
conclusion.  Plaintiff's [sic] response that
Mr. Delgado told the Officers that Mr. White
was not the suspect is an out of court
statement offered to prove Mr. White's
innocence is hearsay and lacks a proper
foundation.  Plaintiff's [sic] statement that
Paley and Rendon filed an incomplete report
is hearsay within hearsay and Plaintiff [sic]
fails to provide a proper foundation for each
layer of hearsay.  Moreover, Plaintiff [sic]
speculates about Paley and Rendon's
intentions without offering any proof or
foundation for [their] opinion.

Because Plaintiffs have submitted no admissible evidence to
support their assertions, this fact is undisputed.

UMF 11: Mr. Delgado told Officer Paley that the black male
appeared to going through something in the parking lot that
appeared to be money.

Plaintiffs' oppositions deny this fact based on lack of
sufficient information.  This fact is undisputed because
Plaintiffs have no contrary evidence.

UMF 12: After obtaining Mr. Dy's statement, Officer Rendon
made a broadcast updating the information concerning the

13

suspect's description.  As Officer Rendon gave Mr. Dy a Victim of Violent Crime form letter, Officer Rendon went into the cashier's booth and noticed a camera on the east side of the booth. Officer Rendon had the owner of the Arco station play back the tape of the robbery and rewind the tape to the beginning footage of the actual robbery.  Officer Rendon obtained the tape and took it as evidence to give to the robbery detectives.

Plaintiffs' oppositions assert: "It should be noted that after [Rendon] and Paley reviewed the surveillance tape of the robbery it should have been clear that the suspect was not Derrick White."

Defendants object, contending that this assertion is speculative and without foundation.  Defendants' objection is sustained.  There is no foundation that either Plaintiff saw the tape or has personal knowledge.  Plaintiffs' assertion does not dispute that Officer Rendon obtained the tape and took it as evidence to give to the robbery detectives.  This fact is undisputed.

**UMF 13**: While Officers Rendon and Paley were at the scene, a Hispanic adult female, later identified as Angela Jimenez, approached them.  Ms. Jiminez told the officers that she was driving by the Arco station and saw a suspicious black male wearing a mask running from the station to the parking lot in front of Hanoian's Market, a few minutes prior.

Plaintiffs' oppositions assert:

The only real identification the police

14

claimed they got came from 'Angel Jimenez'
and 'Jesse Hernandez' and there [sic]
original description was a black male, 6"4',
dark complexion, and he wore a ski mask.  All
of this was supposedly seen by them passing
by in full traffic at night in a badly lit
area; in which was totally incorrect.

...

The whole case was a frame up from the
beginning.  Witness's [sic] Angel Jimenez,
Jesse Hernandez were both mislead into lying
on the [Plaintiffs].

Defendants object to these assertions:

Plaintiff [sic] improperly concludes that
'the only real identification' was obtained
from Ms. Jimenez without providing a proper
foundation.  Plaintiff's [sic] statement is
an out of court statement offered to
discredit other witnesses' testimony, and
discount Ms. Jimenez and Mr. Hernandez's
observations.  This statement is hearsay.
Plaintiff [sic] also improperly speculates
and concludes that Ms. Jimenez was misled to
lie without providing evidence to prove [the]
contention.

Defendants further object that Plaintiffs' oppositions are

argumentative: "Plaintiff's [sic] response implies that the

Witnesses' observations are fabricated and wastes time."

Plaintiffs' conclusory and argumentative characterizations

do not rebut the witness' statements.  This fact is undisputed.

UMF 14: Ms. Jimenez told Officer Rendon that after she saw

the black male wearing a ski mask, she thought a robbery might

have occurred at the Arco station.  Ms. Jimenez saw the suspect

get into a black SUV and head northbound from the parking lot.

Ms. Jimenez slowed down to see if the vehicle would catch up to

her so that she could get a closer look at the SUV.  While

15

heading eastbound on Butler, Ms. Jimenez noticed that the black
SUV was possibly a Ford Explorer like she owned.

Plaintiffs' oppositions deny this fact based on lack of
sufficient information.  This fact is undisputed because
Plaintiffs have no contrary evidence.

UMF 15: Ms.  Jimenez told Officer Rendon that the suspect
turned left onto Winery and headed toward Lane.  While at the
stop sign at Winery and Lane, Ms. Jimenez looked to her right and
saw the suspect turn right, eastbound, onto Lane.  Ms. Jimenez
told Officer Rendon that she saw the suspect without the ski mask
on, that he was in his late 20's or early 30's, had a bald head,
was about 6'4", and had a darker complexion.  Ms. Jimenez told
Officer Rendon that she saw the suspect get into this vehicle.

Plaintiffs do not specifically respond to this fact.
However, logically, their opposition should be the same as set
forth in UMF 13 as should Defendants' objections.

For the reasons set forth in UMF 13, this fact is
undisputed.

UMF 16: Ms. Jimenez told Officer Rendon that, upon closer
inspection of the suspect's vehicle, it had gold trim and was a
2-door vehicle with all of the back windows tinted.  Ms. Jimenez
told Officer Rendon that when she initially saw the suspect
fleeing the Arco station, he had something in his hand, but she
was not sure.  Ms. Jimenez said that she wrote down the license
plate number of the suspect vehicle, that the plate number was
4SXN116, that she did not miss any numbers or letters on the

16

license plate, but that she might have switched around one or two letters.  Ms. Jimenez then proceeded north on Winery and saw the suspect vehicle headed eastbound on Lane toward Willow.

Plaintiffs' oppositions dispute this fact, contending:

> Since the Plaintiff's vehicle was parked at the apartment complex and was not present at the crime scene, they deny that Ms. Jimenez was able to write down the Plaintiff's license plate number and that she did miss some numbers and letters.  This denial will apply hereinafter to any area of the Defendant's [sic] motion which states that the witness was able to write down the Plaintiff's license plate number at the scene.

> ...

> The only way the defendants were able to include the license plate numbers and car description in the report was because they can check on all parolee's [sic] in the area after they came up with my address and they contacted the Plaintiff's parole agent, Joyce Cresar [sic].  (See witness statement from original police report and Officer Paley statements during preliminary examination transcript for the inconsistent statements made by the witness's [sic] as well as Officer Paley).

Defendants object:

> Plaintiff [sic] fails to provide evidence to show that the Defendants retrieved the Plaintiff's license plate number by accessing the parolee list.  Plaintiff's [sic] response speculates, and infer that the Officers [sic] method of obtaining the Plaintiff's [sic] license plate number was improper without providing any evidence to establish [their] conclusion.

Defendants' objection is sustained.  Plaintiffs offer no foundation or personal knowledge to show how law enforcement, not

17

1  Ms. Jimenez, "accessed" a "parolee list."  This fact is

2  undisputed.

3      **UMF 17**: After giving her statement to Officer Rendon, Ms.

4  Jimenez told him that her husband, Jesse Hernandez, also saw what

5  happened because he was a passenger in Ms. Jimenez's vehicle.

6      Plaintiffs' opposition denies this fact based on

7  insufficient information.  This fact is undisputed because

8  Plaintiffs have no contrary evidence.

9      **UMF 18**: Officer Rendon spoke with Mr. Hernandez.  Mr.

10 Hernandez said that when he and his wife were heading east on

11 Butler, he looked to his right and saw a black male running from

12 the Arco station.  Mr. Hernandez, who thought a robbery had just

13 occurred, took a closer look and saw that the suspect was wearing

14 a ski mask.  As Ms. Jimenez slowed their vehicle, Mr. Hernandez

15 saw the suspect get into a black SUV located on the east side of

16 the parking lot in front of a laundromat.  Mr. Hernandez saw the

17 suspect pull out of the driveway on the north side of the parking

18 lot and behind their vehicle.  While heading east on Butler, Mr.

19 Hernandez realized that the suspect was not wearing a ski mask

20 and that he was driving like nothing had happened.

21     Plaintiffs' oppositions deny this fact based on insufficient

22 information.  These facts are undisputed because Plaintiffs have

23 no contrary evidence.

24     **UMF 19**: Mr. Hernandez told Officer Rendon that he got a good

25 look at the suspect.  He described him as a black male adult with

26 dark clothing on top, a bald head, and a slight mustache.  While

at the stop sign at Winery and Lane, the suspect's vehicle was next to theirs.  Mr. Hernandez described the suspect's vehicle as a black 2-door SUV, possibly a Ford Explorer, with chrome rims.

Plaintiffs' oppositions do not respond specifically to this fact.  It is admitted.

**UMF 20**: On March 15, 2004, at approximately 9:00 p.m., Detective Harrell was notified by Officer Paley about the armed robbery at the Arco station.

Plaintiffs' oppositions do not respond to this fact.  It is admitted.

**UMF 21**: Officer Paley gave Detective Harrell the license plate number received from Ms. Jimenez and told him that Ms. Jimenez was positive of the numbers but was unsure if the letters were in the same order she had written down.  Officer Paley then checked the license plate number, 4SXN116, as well as all possible variations of the letter sequence.  Only one license plate came back to the Southeast area.  Officer Paley gave this information to Detective Harrell.

*See* Plaintiffs' oppositions to UMF No. 16, Defendants' objections and the Court's rulings.  This fact is undisputed.

**UMF 21 and 22**: On March 15, 2004 at approximately 9:00 p.m., Detective Knight spoke with Officer Paley and Detective Harrell. Upon obtaining the information regarding license plate number 4SXN116 from Officer Paley, Detective McKnight checked the DMV registration on the computer and discovered that it was registered to either Alice White or Patricia Falls at 194 N.

19

Willow, Apt. 113, Fresno.

*See* Plaintiffs' oppositions to UMF No. 16, Defendants' objections, and the Court's rulings.  This fact is undisputed.

<u>UMF 24</u>: Detective McKnight ran the address of 194 N. Willow, Apt. 113, in the Fresno Police Department RMS system to check for any service calls at that location.  Detective McKnight observed that one of the individuals contacted at 194 N. Willow, Apt. 113, was Derrick Clayton White, DOB 1/10/65.  The Fresno Police Department RMS showed Derrick White to be a black male. Detective McKnight believed that this fact was relevant to the robbery investigation because the suspect had been identified as a black male.

Plaintiffs' oppositions deny part of this fact based on insufficient information and admit the balance.  This fact is undisputed.

<u>UMF 25</u>: Detective McKnight checked the name Derrick Clayton White, DOB 1/10/65, in the California DMV warrants system.  The California DMV warrants system showed Derrick Clayton White as currently on active parole to Fresno County for a PC 211 [robbery] and that Derrick White's parole agent was Joyce Kreiger [sic].

Plaintiffs' admit this fact.

<u>UMF 26</u>: Detective McKnight ran a further criminal history check of Derrick Clayton White which revealed an extensive violent armed robbery history dating back to 1982.  Derrick White was currently on parole for armed robbery and last sentenced in

1994 for armed robbery to 15 years in the California Department
of Corrections.

　　　Plaintiffs admit this fact.

　　　<u>UMF 27</u>: Based on the information Detective McKnight had
received from Officer Paley, with the description of the suspect
vehicle and license plate number, and further research of the
information of the RO's address and discovery that Derrick White
was on parole for armed robbery, Detective McKnight believed
Derrick White was most likely the suspect for the robbery at the
Arco station.

　　　Plaintiffs' oppositions deny this fact based on insufficient
information.  This fact is undisputed because Plaintiffs have no
contrary evidence.

　　　<u>UMF 28</u>: Officer Desmond contacted Derrick White's parole
agent, Joyce Cregar [sic] and gave her the updated information.
Ms. Cregar advised Officer Desmond that the suspect vehicle from
the Arco station robbery was consistent with the vehicle
information listed on Derrick White's parole packet.  Ms. Cregar
authorized a parole hold on Derrick White and, if Derrick White
was contacted, a search of his residence at 194 N. Willow, Apt.
113.

　　　Plaintiffs' opposition denies this fact based on
insufficient information and denies it "since the Plaintiff's
vehicle was not at the scene of the crime."

　　　Plaintiffs' opposition does not create an issue of fact with
regard to UMF 28.  All it says is that the description of the

21

suspect vehicle was consistent with the vehicle information listed in the parole packet.  This fact is undisputed.

**UMF 29 and 30**: On March 15, 2004, Sergeant Manfredi and other detectives of the Street Violence Tactical Unit were notified by Detective Harrell of the circumstances of the Arco station robbery and the results of the investigation.  Detectives McKnight, Desmond and other detectives conducted a surveillance of 194 N. Willow, Apt. 113.

Plaintiffs' oppositions denies this fact "because if there were surveillance at 194 N. Willow, Apt. 113 the Defendants would've saw [sic] Derrick White's car, and would've seen him leave to go get some food (since there in only one way to exit and enter).

The time periods are not specified.  It is not possible to determine to what extent this fact is disputed.

**UMF 31 and 32**: Sergeant Chris Chastain, whose unit began surveillance at 9:45 p.m., advised Sergeant Manfredi that they had checked the entire apartment complex and that the apartment appeared dark and the suspect vehicle was not there.  The area to the front of the apartment (south) was a no parking area and no vehicles were parked there.  At 10:30 p.m., Sergeant Chastain did a walk-through of the apartment complex and did not see the suspect vehicle.

**UMF 33**: At 1:20 a.m. on March 16, 2004, Officer Desmond observed the suspect vehicle driving southbound on Willow, approaching the apartment complex.  Officer Desmond notified

assisting units and Sergeant Manfredi.  Sergeant Manfredi noted there was only one entryway for vehicles to enter or exit the apartment complex.

Plaintiffs admit this fact.

**UMF 34, 35 and 36**: Officer Ron Flores was advised at 9:45 p.m., March 15, 2004, to respond to 194 N. Willow because of the robbery of the Arco station and was given a description of the suspect vehicle and the license plate number.  Officer Flores conducted surveillance of the apartment complex in an attempt to locate the vehicle and the suspect.

Plaintiffs' opposition denies this fact in part based on lack of sufficient information and because "Plaintiff's car wasn't at the seen [sic] of the crime."  To the extent that Plaintiffs' denial is based on lack of insufficient information, the fact is undisputed because Plaintiffs have no contrary evidence.  Their assertion that Derrick White's vehicle was not at the scene of the robbery does not dispute the facts set forth in UMF 34, 35 and 36.  These facts are undisputed.

**UMF 37**: At approximately 1:15 a.m., March 16, 2004, Officer Flores saw the vehicle and suspect matching the descriptions given to him drive into the apartment complex at 194 N. Willow. The vehicle was stopped and the suspect detained.

Plaintiffs admit this fact with the proviso that they claim Derrick's  car was not at the scene of the crime.

**UMF 38**: While looking at the vehicle and the suspect, Officer Flores realized that he had seen the vehicle and the

23

1  suspect driving westbound on Kings Canyon from Maple at

2  approximately 9:30 p.m. on March 15, 2004.

3       Plaintiffs' oppositions deny this fact because they claim

4  Derrick's vehicle was not at the scene of the crime.

5       <u>UMF 39</u>: The suspect vehicle pulled into the parking stall

6  for Apt. 113.  The driver, Derrick White, exited the vehicle and

7  was confronted by Officers Desmond and Boccasile.  Officers

8  Desmond and Boccasile made quick observations of the vehicle to

9  ensure that there were no accessible weapons or other occupants.

10  Derrick White was taken into custody and advised that he was in

11  custody for a parole violation.  Sergeant Manfredi came to the

12  apartment and made contact with Officer Desmond and Sergeant

13  Chastain.  Sergeant Manfredi saw that the vehicle matched the

14  vehicle described by witnesses to the Arco station robbery and

15  that Derrick White's appearance was consistent with the

16  description of the robber.

17       Plaintiffs deny this fact based on insufficient information

18  and based on their contention that Plaintiff's vehicle was not at

19  the scene of the crime.  To the extent that Plaintiffs' denial is

20  based on lack of insufficient information, these facts are

21  undisputed because Plaintiffs have no contrary evidence.  To the

22  extent that Plaintiffs dispute these facts on the ground that

23  Derrick's vehicle was not at the scene of the robbery, the facts

24  in UMF 39 are not disputed because all it states is that

25  Derrick's vehicle and Derrick matched descriptions given to the

26  police by witnesses to the robbery.

**UMF 40**: A parole search was conducted of Derrick White's residence.  During that search, a handgun and a magazine with ammunition were located.  Alice White, Derrick White's wife, stated that the gun belonged to her.

Plaintiffs' oppositions admit this fact.

**UMF 41**: Sergeant Manfredi was advised by Officer Desmond that $158.54 was found in Derrick White's right front pants pocket in denominations of 1 twenty dollar bill, 7 ten dollar bills, 7 five dollar bills and 33 one dollar bills.  This was consistent with the money taken from the till of a business.  Taken from Derrick White's right rear pants pocket was a thin mesh white beanie and a black beanie.  The white beanie was consistent with Officer Flores' observation when he saw the suspect vehicle on March 15, 2004.

Plaintiffs' oppositions deny this fact "since Derrick White has no pockets in his basketball shorts."

This fact is disputed.

**UMF 42**: Sergeant Manfredi conducted a parole search of Derrick White's residence and Officer Arellanes made contact with Alice White.  Officer Arellanes searched the bottom floor of the apartment and Officer Dooms and Sergeant Manfredi search the second floor of the apartment.

Plaintiffs' oppositions do not specifically refer to this fact.  It is admitted.

**UMF 43**: Prior to conducting the search of the second floor, Sergeant Manfredi asked Alice White if she knew that Derrick

White was on parole and a convicted felon.  Alice White stated that she knew these things.

Plaintiffs' admit this fact.

UMF 44: Without being asked, Alice White told Sergeant Manfredi that Derrick White had been home between the hours of eight and eleven o'clock.  Alice White said that Derrick White had just left the residence.  Sergeant Manfredi advised Alice White that that was not true because officers had been at the apartment complex for some length of time.  Alice White denied this and maintained that she and Derrick White had been at the residence, as had the vehicle.

Plaintiffs' opposition denies this fact contending that Alice White was asked about Derrick's whereabouts between 8:00 and 11:00, i.e., that Alice White did not volunteer the information.

Defendants' objection refers to that portion of Plaintiffs' opposition where Plaintiffs' assert: "[I]f there were surveillance at 194 N. Willow, Apt. 113 the Defendants would've saw [sic] Derrick White's car, and would've seen him leave to go get some food (since there in only one way to exit and enter)." Defendants object:

> Plaintiff [sic] fails to provide any evidence to disprove that the Defendants' had the apartment complex under surveillance.  Plaintiff [sic] concludes that the Officers took 'too long' without providing a basis for her conclusion.  Plaintiff [sic] further speculates as to what the Officers would have seen had they been present at the scene.  This speculation is also argumentative.

1    This fact is disputed.

2    **UMF 45**: While searching the second floor of the apartment,

3    Sergeant Manfredi saw a black purse on the dresser in the master

4    bedroom.  A compact Glock, model 27, .40 caliber handgun was

5    sitting in the purse with the grip end pointing up.  The

6    handgun's magazine was loaded but there was no round in the

7    chamber.  The serial number of the handgun was CVL694US.  No

8    registration for the handgun was found.

9    Plaintiffs' opposition denies this fact to the extent it

10   implies that the weapon was in plain view contending: "Alice

11   White's handgun was not in plain view since it was in a closed

12   container (zipped purse)."

13   This fact is disputed to the extent that the weapon was in

14   plain view; otherwise the fact is undisputed as to the fact that

15   Manfredi saw the purse.

16   **UMF 46**: Sergeant Manfredi was present at the identification

17   of Derrick White.  Sergeant Manfredi asked Mr. Dy what the weapon

18   had looked like.  Mr. Dy said that the weapon was black, possibly

19   a 9mm and had a flat top.  A 9mm and a .40 caliber have the same

20   frame.  This description was consistent with the Glock, Model 27

21   located in the master bedroom.  Also in the master bedroom on the

22   dresser was $100 in five 20 dollar bills and another five dollar

23   bill was found on the bedroom floor between the dresser where the

24   handgun was found.

25   Plaintiffs' oppositions deny this fact based on insufficient

26   information.  This fact is undisputed because Plaintiffs have no

27

1   contrary evidence.

2       **UMF 47**: There was a multi-drawer dresser to the left of the

3   bed that had male clothing in it.   There were several knit

4   beanies, two black and the others white and red, two pairs of

5   leather gloves, several bandanas, several knit caps, and several

6   wave caps.   The gloves and the beanies were consistent with the

7   descriptions provided by witnesses to the Arco robbery.   There

8   was other male clothing in the drawers.   A closet along the west

9   wall contained a mixture of male and female clothing, the

10  majority being male clothing.   The male clothing was of a size

11  consistent with that worn by Derrick White.   There was also a

12  large assortment of tennis shoes (size 9), dress shoes, ball caps

13  and dress hats.   The clothing in the closet was depicted being

14  worn by Derrick White in several photographs throughout the

15  apartment.

16      Plaintiffs' oppositions deny this fact:

17              [T]he gloves, beanies, and the description
                that the witnesses gave doesn't match Derrick
18              White.   Derrick White is not of a medium or
                dark complexion.   Derrick White does not have
19              black hair as the victim, David Dy, described
                in the Defendant Motion for Summary Judgment.
20              The witnesses described the suspect to have
                on a ski mask, but not a beanie that the
21              Defendants claimed to have found in Derrick
                White's pocket (which he didn't have any
22              pockets).

23      This fact is disputed.

24      **UMF 48**: Sergeant Manfredi went downstairs and spoke with

25  Alice White again.   He asked her if there was anything she wanted

26  to say.   Alice White said there was a gun in the apartment.

28

Sergeant Manfredi again asked Alice White if she knew Derrick White was on parole.  Alice White said yes and that he was a convicted felon and banned from having weapons.  Alice White said that she bought the gun two years previously from an unknown person while Derrick White was in prison.  Later Alice White said she bought the gun from an unknown person for $300, three years previously.

Plaintiffs' oppositions deny this fact, contending:

> Alice White was questioned about the gun the
> Defendants illegally found.  She didn't tell
> them where it was located or when and how
> much she bought it for.

This fact is disputed.

UMF 49: Alice White told Sergeant Manfredi that Derrick White did not know about the handgun and that he did not stay in her bedroom where the gun was kept.  Sergeant Manfredi asked where Derrick White stayed.  Alice White said he stayed in the other bedroom and that his former parole agent told Derrick White that he should put his items in that bedroom and stay in a separate bedroom.  Sergeant Manfredi stated that the majority of Derrick White's clothing was in the master bedroom and Alice White denied that Derrick stayed in the master bedroom.  Sergeant Manfredi asked Alice White if Derrick White had access to the handgun.  Alice White said that she had the gun in her purse and Derrick White never used the weapon.  Alice White also said that her purse was closed and she had not allowed Derrick to use the gun.

1   Plaintiffs' oppositions deny this fact because "Alice White

2   did not inform Sergeant Manfredi about her and her husband's

3   sleeping arrangements [and] because Alice White was able to

4   describe the handgun when asked."

5       This fact is disputed.

6       UMF 50: When asked about a description of the gun,

7   Alice White told Sergeant Manfredi that she did not know what

8   caliber it was or how to operate the gun.  She did say she knew

9   the gun was a Glock and maintained that Derrick White had been

10  home until slightly before the officers arrived and had been with

11  her the entire time.

12      Plaintiffs' oppositions deny this fact "because Alice White

13  was able to describe the handgun when asked."

14      This fact is disputed.

15      UMF 51: Officer Arrelanes told Sergeant Manfredi that she

16  located a black leather jacket in the kitchen/washroom area of

17  the apartment that appeared to belong to Derrick White.  There

18  was also a pair of blue Levis in this area.  Officer Arrelanes

19  told Sergeant Manfredi that a pair of shoes identified as Derrick

20  White's were found in the area above the washing machine.  One of

21  these shoes had a semi-automatic pistol magazine in it.  Sergeant

22  Manfredi observed that this was the same type magazine loaded in

23  the Glock and was the same caliber as the Glock.

24      Plaintiffs' oppositions deny this fact "because the leather

25  jacket wasn't in the kitchen and washroom area but in a bedroom."

26      This is an immaterial variance; these facts are undisputed.

30

**UMF 52**: Sergeant Manfredi decided to take Alice White into custody for providing a weapon to Derrick White and for providing false information to the officers, thus delaying the investigation.  Both Alice White and Derrick White were transported to police headquarters.

Plaintiffs' oppositions deny this fact, "since Alice White never provided the gun to Derrick White [and t]he gun was illegally found in her zipped purse."

Plaintiffs' oppositions do not dispute the reason Alice White was taken into custody; this fact is undisputed.

**UMF 53-55**: Sergeant Manfredi advised Detective Harrell of the results of the surveillance, the search of the vehicle, Derrick White's person, and the apartment, his questioning of Alice White, and the arrests of Alice White and Derrick White. Sergeant Manfredi requested that Detective Harrell contact the primary investigating officers and coordinate an in-field show up and to interview Derrick White and Alice White.  Detective Harrell agreed to do so.

Plaintiffs' oppositions deny these facts based on insufficient information.  These facts are undisputed because Plaintiffs have no contrary evidence.

**UMF 56**: Detective Harrell requested that Officers Rendon and Paley bring the victim and witnesses to 194 N. Willow for a field show up.  Officers Rendon and Paley transported Mr. Hernandez and Ms. Jimenez separately to 194 N. Willow, while Officer Russian brought Mr. Dy.

1     **UMF 57-58**: Upon arrival at 194 N. Willow, Apt. 113, Officers

2 Rendon and Paley separately gave Mr. Hernandez and Ms. Jimenez

3 the admonishment for in-field identifications that they were

4 going to see a vehicle that might have been involved in the

5 robbery and a suspect who may or may not have committed the

6 robbery.  The officers said that, even though Derrick White was

7 in handcuffs, it did not mean he was under arrest, that they

8 would need to keep an open mind, to take their time in making a

9 decision, and to tell the officers why and how they came to their

10 decision.

11     Plaintiffs' oppositions deny the facts representing UMF 57-

12 63 in Defendants' narrative description of the facts:

13         The Plaintiffs denies [sic], based upon the
        lack of sufficient information, the first

14         four paragraphs on page 9, lines 1-22, except
        for lines 23-24 in the fourth paragraph

15         because the witness told the officers that
        Derrick White's cloths [sic] that he was

16         wearing didn't match the clothes she saw on
        the robber.  The Plaintiff must bring to the

17         courts attention that in criminal court the
        Prosecutor's investigator reported that the

18         victim, the witnesses who claimed to have
        seen the robber with his mask off, couldn't

19         positively identify the [sic] Derrick White
        as the robber.  (Please see District Attorney

20         Investigator JJ Smith report)According [sic]
        to the Plaintiff's investigators in the

21         criminal case, Apolonio Delgado said that the
        officers had the wrong guy.

22

23     Plaintiffs' oppositions do not dispute UMF 57-58.  These

24 facts are undisputed as to what actions the officers took.

25     **UMF 59-60**: While approaching the area where the vehicle and

26 Derrick White were, Officer Rendon activated his spotlight, lit

up the suspect vehicle which was parked in the stall, and asked Ms. Jimenez if she had a clear view of the vehicle.  Ms. Jimenez immediately said, "Yep, that's it".  Ms. Jimenez stated the reason she knew this was she knew the tire size and color of the suspect vehicle and recalled a luggage rack on the top.  She said this was definitely the vehicle she observed suspect Derrick get into and the one that followed her.  Ms. Jimenez said that the license plate number was the one that she looked at because it matched what she had written down.

This fact is undisputed.

**UMF 61**: Officer Rendon had Derrick White exit a patrol car and shined his overhead and spotlights onto Mr. White.  Ms. Jimenez had a clear and unobstructed view of Derrick White.  Ms. Jimenez was told to take her time and take a good look at the suspect.  Ms. Jimenez immediately said, "Yep, that's him".  She indicated that Derrick White was the person she saw running from the Arco station and driving the vehicle.

This fact is undisputed.

**UMF 62**: Mr. Hernandez stated that the black SUV at 194 N. Willow was the same vehicle that had left the parking lot by the laundromat and positively identified Derrick White as the person he had seen driving that vehicle.

This fact is undisputed.

**UMF 63**: Sergeant Manfredi showed Ms. Jimenez a leather jacket but Ms. Jimenez was not sure if this was the leather jacket she had seen on the suspect

33

1    This fact is undisputed.

2    <u>UMF 64</u>: Following their arrests and transportation to Fresno

3    Police Department headquarters, Derrick White and Alice White

4    were placed in holding cells in the I Bureau.  There are three

5    cells with cement walls between them and open front iron bars.

6    Derrick White and Alice White were put in cells next to each

7    other and could easily communicate back and forth.  As Sergeant

8    Manfredi entered the I Bureau area, he heard Derrick and Alice

9    White talking.  Derrick White was attempting to get his alibi

10   straight with Alice White, telling Alice that he had been home

11   between the hours of seven and eleven o'clock and had been

12   watching Steven Segal films.  Sergeant Manfredi concluded that

13   Derrick White was giving directions to Alice.

14       Plaintiffs' oppositions deny this fact:

15           [T]hey weren't discussing their alibi but
             trying to figure out why they were arrested
16           without their Miranda Rights read to them.

17   In the portion of their oppositions captioned "Defense",

18   Plaintiffs assert:

19           In addition to conspiring with Sgt. Manfredi,
             Det. Harrell lied about the plaintiff and his
20           wife making statement [sic] regarding the
             matter while they were in the holding cells.
21           This was an attempt to build a case because
             defendants had no evidence to go forth with
22           the case; therefore they made one up as the
             case is still going on.
23

24       Defendants object:

25           Plaintiff [sic] has failed to offer any
             evidence that Mr. Manfredi lied about the
             conversation between her and her husband
26           while they were placed in the jail cells.

                              34

> Plaintiff improperly concludes that she and her husband were being framed without providing any substantive evidence to establish her conclusion.

The scope and purpose of the discussion between Alice White and Derrick White are disputed.

UMF 65: Once both Derrick White and Alice White were transported to the I Bureau, Detective Harrell contacted Derrick White in a holding cell and advised him of his Miranda rights via a department issued card.  Derrick White stated he understood his rights and wanted to know why he was under arrest.  He was advised that he and the vehicle he was driving had been identified by witnesses as being involved in an armed robbery.  Derrick White was also told that evidence such as the weapon used, clothing and the proceeds from the robbery were located at his residence and on his person.

It is disputed whether Derrick White was advised of his Miranda rights; otherwise this fact is undisputed.

UMF 66: Derrick White was upset and stated to Detective Harrell "clothing, man, I got lots of jackets, how they know that one?  What gun, I ain't got no gun on me."  Detective Harrell told Mr. White he never said anything about a gun or jacket and asked him how he knew a gun and jacket were involved.  Derrick White then stated, "Man, I ain't saying shit.  I beat this court, I'll wait for my lawyer".  Detective Harrell asked no further questions and Derrick White was processed at the I Bureau and later booked into the Fresno County Jail.

35

1    Plaintiffs' oppositions deny this fact because "they weren't
2    read their Miranda Rights" and because "Derrick knew about the
3    gun after his wife told him, while they were in the jail cell,
4    that she had a gun for self-defense due to a past abusive
5    relationship with a man she'd known before she had married
6    Derrick White."

7    This fact is disputed.

8    **UMF 67**: On February 10, 2005, Derrick White was held to
9    answer by a state Superior Court judge following a preliminary
10   hearing, on charges of second degree robbery, in violation of
11   California Penal § 211, and possession of a firearm by a felon,
12   in violation of California Penal Code § 12021(a)(1).

13   Plaintiffs admit this fact.

14   D.   **Plaintiffs' Assertions In Opposition to Motion for**
15   **Summary Judgment**.

16   Because Plaintiffs' respective assertions in opposition to
17   the motion for summary judgment are essentially identical, only
18   that of Alice White is set forth.  Both oppositions are signed
19   under penalty of perjury and are several pages long.  All
20   misspellings and incorrect grammar are in the original:

21                **PLAINTIFF'S DEFENSE**

22          Disputed material facts relevant to
             unwarranted arrest, detention by defendant;
23          assault and battery, false imprisonment,
             criminal negligence, unreasonable seizure,
24          excessive force, violation of rights to due
             process of law, deprived life and liberty
25          interest, emotional distress, violations of
             the fourth (4th) and fourteenth (14th)
26          amendments were all violated by the officers,

                              36

detectives, and Sgt. Manfredi of the Fresno Police Dept.

1) Officer Roland Rendon report and declaration:

First of all, officers Peterka and Lopez were the first to respond to the scene of the robbery, not Rendons or Paley.

Second, there was never an accurate description given of the suspect 'or' of his face 'nor' was the plaintiff's husband (Derrick White) ever identified by the victim.  In fact the only real identification the police claimed that they got came from 'Angel Jimenez' and 'Jesse Hernandez' and there [sic] original description was a black male, 6"4', dark complexion, and he wore a ski mask.  All of this was supposedly seen by them passing by in full traffic at night in a badly lit area; in which was totally incorrect.  The only real witness who was actually able to give a somewhat accurate description was 'Apolinio Delgado' and he already told the Police, the D.A. and Plaintiff's investigators that he was sure the Plaintiff's husband was not the suspect he saw on the night of March 15th, 2004.  In truth, Delgado statement that Officers Paley and Rendon filed in there report was incomplete and was intentionally misleading because Aplinios Delgado had a lot more to say about the night in question.  It's very important to remember that fact because Officers Rendons and Paley deliberately left out Delgado statements along with anything else that would show or prove that the Plaintiff and her husband was not guilty. The police attempted to undermine their own investigation in order to kill any chance for the Plaintiff to have a defense.  When the court looks at all the evidence against the Defendants it will be clear that the police tried to frame the plaintiff for a crime he did not commit (see investigation report from Dave Shovon).  It should be noted that after Rendo's and Paley reviewed the surveillance tape of the robbery it should have been clear that the suspect was not the 'Derrick White' coupled with the fact that the victim David

37

Dy never seen a weapon as stated in the 911
dispatch report along with his statements
concerning the weapon show he was being
mislead as well as the fact that there was
never a ski mask 'or' Newport Cigarettes ever
found at the Plaintiff'S home.  All of this
was left out of the police reports.  The
victim David DY never tried to describe
different types of guns until her came in
contact with the officers in this case.  From
that point on the gun description changed
repeatedly until he found the Plaintiff
(Alice White) gun in her purse when Sgt.
Manfredi illegally searched it.  This whole
case was a frame up from the beginning.
Witness's Angel Jimenez, Jesse Hernandez were
both mislead into lying on the plaintiff and
her husband.  When it came time for the above
witnesses to come forward in court they
refused to come even after a body attached
warrant was ordered against them, they still
refuses to show up.  Now the defendant's in
this civil case are stating their reason why
there witnesses refuse to show up at court
was because they were scared, even though
they were never approached by anyone other
than the police.  In-short, these two
witnesses were never valid and never should
have been use against Plaintiff's husband to
begin with.  Also, Defendants claim to have
had the Plaintiff's apartment complex under
surveillance all night long which is not
true, because it took the police too long
just to respond to the robbery.  If they
would have had the complex surrounded they
would have saw the Plaintiff's husband leave
to go get food from Alberto's but they didn't
because they weren't there when the
Plaintiff's husband left his home.  Even
after they followed the Plaintiff back into
the complex they never mentioned the food he
was holding from Alberto's in the police
report; even though Det. Desmond took the
food from the Plaintiff's husband, brought it
into the house.  The Plaintiff's husband's
wallet was in the truck but Defendants failed
to mention it in the police report; even
though they took $154.00 from the wallet and
claimed to take it from the Plaintiff's
husband's pockets.  Please consider that he
had no pockets in his basketball shorts.  The

Defendants were searching the Plaintiff's upstairs of the apartment when Sgt. Manfredi illegally search the Plaintiff's purse and found her small gun that the Plaintiff's husband (Derrick White) wasn't aware of at the time.  Defendant also took money out of her purse, took pictures of it, then put it with the money they took out of her wallet and said it came from the robbery.  They actually stole it from the Plaintiff and turned around to use it against the Plaintiff's husband.  This kind of misconduct was done to the plaintiff throughout this case and is the very reason why this civil action is necessary.  The evidence needed is provided by the defendant's own inconsistent report, failure to properly investigate not to mention there willingness to lie, and frame the plaintiff for crimes we did not commit.  It's easy to see that defendants were motivated by hatred, and callous indifferences.  It should be noted that Sgt. Manfredi is already fired for these same charges that we were and still are accusing him and the rest of the defendant's mentioned in this civil action.

Sgt. Manfredi conspired with the defendants to give the plaintiff's husband a life sentence in prison; the plaintiff (Alice White) jail time for crimes she didn't commit and to be-little the Plaintiff as much as possible.  Sgt. Manfredi actions were motivated by evil motive which caused his judgment to become reckless and dangerous toward the plaintiff.  Sgt. Manfredi violated the plaintiff's rights repeatedly, threatened and assaulted both the plaintiff and her husband for simply exercising there right to be informed and to be treated fairly under the Fourth and Fourteenth Amendments.  Sgt. Manfredi was fired for the same violations in this case.  Complaints were filed in 2004 by us and the Police Dept. has yet to process them.  This unprofessional, poor manner and service is the cause of this civil case against The City of Fresno and each officer who was acting under color of authority on March 15th, 2004.  Plaintiff and her husband is currently suffering from emotional distress, defamation of character and public

humiliation, financial losses and expense due to have to fight for our rights from the following officers: Sgt. Manfredi, Det. Harrell, Roland Rendons, and the rest of the defendants who responded to our apartment, who failed to serve and protect.  Each officer has done nothing to stop plaintiff's rights from being violated and due to that they are all equally responsible.

Det. Harrell conspired with Sgt. Manfredi, Officer Rendon, Paley to give the Plaintiff's husband a life sentence and the plaintiff time in jail for crimes they didn't commit. Det. Harrell knew from surveillance tape of the robber and inconsistent statements from witness's along with the parole search of plaintiff apartment that which turned up with nothing consistent with a robbery.  He was aware that the money that was taken out of plaintiff's purse was used to stage a false crime against the plaintiff's husband.  He knew of the inaccurate reports that his fellow officers gave regarding the ski-mask and the pack of Newport Cigarettes that were never found.  The only way the defendants were able to include the licenses plate numbers and car description in the report was because they can check on all parolee's in the area after they came up with my address and they contacted the Plaintiff husband's parole agent, Joyce Cresar.  (See witness statement from original police report and Officer Paley statements during preliminary examination transcript for the inconsistent statements made by the witness's as well as Officer Paley).

All defendants conspired with Sgt. Manfredi, Rendons, Paley, Harrell to frame plaintiff due to the plaintiff husband's past record; not because she was guilty, but because it was convenient for the defendants to close a case by using him.  Please note that Det. Harrell, McKnight, Ron Flores, Officer Joe Martin had not bothered to file a 'proper' police report in this matter until the found out they were being sued.

In addition to conspiring with Sgt. Manfredi, Det. Harrell lied abut the plaintiff and the

Plaintiff making statement regarding the
matter while they were in the holding cells.
This was an attempt to build a case because
defendants had no evidence to go forth with
the case; therefore they made one up as the
case is still going on.

Det. Mcnight conspired with Sgt. Manfredi,
Officer Rendon, Paley to give the Plaintiff's
husband a life sentence and the plaintiff
time in jail for crimes they didn't commit.
Det Mcnight proved plaintiff's point that
this was the police's attempt to build a case
and they had no evidence by running
plaintiff's information through the system
and finding out about his past records.  This
was their evil motive.  Det. Mcnight had not
bothered to file a 'proper' police report in
this matter until the found out he was being
sued.

## INCIDENT REPORT

On Monday, March 15, 2004 my husband wen to
the store per my request.  He drove to
Alberto's around 11:45pm.  I got out of the
shower and around 12:45am and heard commotion
outside.  He had come back with two shrimp
dinners, but was followed by multiple cops
from the Fresno Police Dept.  I went out to
ask my husband what was going on.  Officer
Doomed was in my house and had pushed me
against the table claiming they were doing a
parole search.  Later on we had notice there
were no parole officers present.  It was a
total of 19 cops in different cars and
trucks.  As my husband was outside holding
the two dinners he was ordered out of his car
and approached by Det. Desmond, and Robert
Boccascile.  They were later identified
because they refused to give their names when
I asked for it.  Det. Desmond took the two
dinners into my home but failed to mention
that in his report.  The officers claimed to
be there for a parole search.  but they were
actually there to frame me for a robbery,
which at the time he was at Alberto's.
Everything that pointed to my husband and my
innocence in the robbery, they all at the
same time conveniently left out.  Sgt.
Manfredi, Officer Dooms, and Arellanes were

41

violating my rights while staging a crime.  I
was trying to ask the officers why they were
going through my assets since I'm not on
parole and Officer Michael grabbed me from
the stairs and threw me on the couch and said
'black bitch don't move'.  I was questioned
about how we could afford our assets and
other harassing inquiries.  Then Officer
Michael illegally searched my zipped purse.
He ask me for permission and I told him no.
He unzipped it and searched anyways.  I
informed him that I am not on probation so he
has no right to search my closed purse or
anything else of mine.  He took money from my
purse and claimed in the report that it was
taken from my husband's pocket.  That is
false because he didn't have pockets and the
money was from my purse.  Later on they
brought the alleged victim to my home.  He
could not identify my husband, (Derrick
White), even after an improper line-up.
Derrick White was the only person in the
line-up.  The police made a deliberate effort
to deny his rights by misleading the alleged
victim by not conducting a proper six (6) man
line-up.  They knew that since the victim
himself couldn't ID my husband the witness
wouldn't be able to either.  My husband could
clearly hear one of the victims in the car
say that the person who robbed the store was
bigger than my husband and he was dressed
differently.  At this time Sgt. Manfredi came
out of my house with my leather jacket, the
money and small gun, in which Derrick White
had no knowledge of, from my purse.  He
claimed to the victims that he had found the
weapon and clothes so he pretty sure my
husband was the guy.  All of these actions
were illegal because the line-up was
conducted improperly and our Miranda Rights
were not read to us when arrested.  Therefore
my due rights were violated.

Many false accusations were made against me,
Alice White, from Sgt. Manfredi and Officer
Arellens.  All of the officers seemed to be
following Sgt. Manfredi's lead.  We were both
wrongfully arrested and not told for what
when asked.  It wasn't until we were in our
jail cells that we were told that we were
arrested for robbery.  Later on they realized

that we were going to beat the robbery charge because we are innocent, they charged my husband for possession of a weapon.  This is all false since the small gun was illegally found in my zipped purse, and Derrick White had no knowledge of the gun.  But again, it was in '*my*' purse.  Even if I gave the officer permission to search her purse (*which I didn't*) the gun still wasn't my husbands, and it was in my possession nor his.  Sgt. Manfredi made the statement to her that 'he' was going to bring us all the way down and take us to the 'poor house' because we would have to spend a lot of money to get this matter fixed.  Please note that my husband and I never had to discuss our alibi because we didn't commit the robbery, but we were trying figure out why the officer's were framing us and why our Miranda Rights were not read to us.  11 ½ months later the charges against me, Alice White, were dropped; but Derrick White was in the county jail for almost 3 years.  They tried to close the case quickly to avoid a lawsuit they are facing now.  It wasn't until two (2) years later when the Fresno Police Dept. was being sued that they realized that no one had answered the complaints we filed with them. We have made complaints for the threats from Sgt. Chastain for verbal threats out of court of life sentencing to my husband, for transferring him to cells without his lawyer, and for hate mail.

E.   <u>FIRST CAUSE OF ACTION FOR VIOLATION OF FOURTH AND FOURTEENTH AMENDMENTS</u>.

The Amended Complaint alleges that Defendants violated Plaintiffs' constitutional rights because:

17. ... 1) Their detention was unreasonable in violation of the Fourth Amendment to the United States Constitution; 2) the arrest was an unreasonable use of excessive force of the Fourth Amendment; 3) the arrest of the plaintiff's [sic] also deprived them of their life and liberty without due process of law under the Fourteenth Amendment to the United States Constitution.

43

> 18.   The unwarranted and senseless arrest of
> plaintiff's [sic] has violated their
> Fourteenth Amendment liberty interest in the
> companionship and support of one another.

1.   <u>Lawfulness of Arrests of Plaintiffs</u>.

Defendants contend they are entitled to summary judgment that the arrests of the respective Plaintiffs was supported by probable cause as required by the Fourth Amendment.

Probable cause for arrest exists if, "under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *Beier v. City of Lewiston*, 354 F.3d 1058, 1065 (9th Cir.2004).  As explained in *Franklin v. Fox*, 312 F.3d 423, 438 (9th Cir.2002):

> Probable cause exists when police have
> knowledge at the moment of arrest of facts
> and circumstances based on reasonably
> trustworthy information that would warrant a
> belief by a reasonably prudent person that
> the person arrested had committed a criminal
> offense ... The evidence need support 'only
> the probability, and not a prima facie
> showing, of criminal activity,' ... and such
> evidence need not be admissible, but only
> legally sufficient and reliable.

a.   <u>Arrest of Derrick White</u>.

Defendants assert that the undisputed facts set forth above demonstrate as a matter of law that the arrest of Derrick White was supported by probable cause.

In addition, because Derrick White was held to answer following a preliminary hearing, Defendants argue that Derrick White is collaterally estopped from contending that his arrest

44

was unsupported by probable cause.  *See Moreno v. Baca*, 2001 WL 1204113 (C.D.Cal.2001), citing, *inter alia*, *Haupt v. Dillard*, 17 F.3d 285, 288-289 (9th Cir.1994); *McCutchen v. City of Montclair*, 73 Cal.App.4th 1138, 1145 (1999).

The doctrine of collateral estoppel, or issue preclusion, prevents relitigation of legal and/or factual issues necessarily considered and determined in a prior legal proceeding between the same parties, or their privies.  *See Allen v. McCurry,* 449 U.S. 90, 94 (1980).  The collateral estoppel doctrine applies to claims brought under 42 U.S.C. § 1983.  *Id.* at 105.  The availability of collateral estoppel is a mixed question of law and fact in which legal issues predominate.  *See Ayers v. City of Richmond*, 895 F.2d 1267, 1270 (9th Cir.1990).  State law governs the application of collateral estoppel to issues that were decided in a prior state court proceeding.  *Allen, id.* at 96.

Under California law, collateral estoppel is applied where: (1) the issue sought to be precluded is identical to that which was decided in a prior proceeding; (2) that issue was actually litigated and necessarily decided in that proceeding; (3) there was a final judgment on the merits; and (4) that party against whom collateral estoppel is asserted was a party or in privity with a party to the prior proceedings.  *McCutchen v. City of Montclair*, *supra*, 73 Cal.App.4th at 1145.  In *Moreno v. Baca*, *supra*, the District Court held:

> It is now also clear, under California law,
> that under the right set of circumstances,
> issues necessarily decided during a

45

> preliminary hearing in a criminal case
> (pursuant to California Penal Code § 871) or
> on a motion to suppress per California Penal
> Code § 1538.5 may be precluded from re-
> litigation in a subsequent civil suit ....
>
> Under California law, a finding in a
> preliminary hearing of probable cause to hold
> a criminal defendant over for trial is a
> final judgment on the merits for *collateral
> estoppel* purposes; an accused can immediately
> appeal the probable cause determination by
> filing a motion to set aside (Cal.Pen.Code §
> 995) and obtain review of the decision on the
> motion to set aside by filing a writ
> (Cal.Pen.Code § 999a).  Further, probable
> cause cannot be litigated further because it
> provides no defense to an accused at trial
> ... Thus, issues necessarily determined in
> that hearing may not be subsequently re-
> litigated.

2001 WL 1204113 at *3.  In *Haupt v. Dillard,* the Ninth Circuit

identified factual circumstances that might limit or eliminate

collateral estoppel effects of a prior criminal preliminary

hearing: (1) where there were facts presented to the judicial

officer presiding over the preliminary hearing which were

additional to (or different from) those available to the officers

at the time they made an arrest; or (2) where tactical

considerations prevented a litigant/prior criminal defendant from

vigorously pursuing the issue of probable cause during the prior

criminal prosecution/preliminary hearing.  *Haupt*, *supra*,  17 F.3d

at 289.  In *McCutchen*, the Court of Appeals further held that an

exception exists to application of collateral estoppel,

> where the plaintiff alleges that the
> arresting officer lied or fabricated evidence
> presented at the preliminary hearing ... When
> the officer misrepresents the nature of the
> evidence supporting probable cause and that

> issue is not raised at the preliminary
> hearing, a finding of probable cause would
> not bar relitigation of the issue of
> integrity of the evidence.

73 Cal.App.4th at 1147.

In his opposition to the motion for summary judgment, Derrick White does not refer to the issue of collateral estoppel or the cases cited by Defendants.  Derrick White's brief essentially argues that he did not commit the robbery and that the officers conspired to frame him for the crime.  None of his various assertions are supported by reference to admissible evidence - they are argumentative and conclusory statements in a brief, albeit under penalty of perjury.  Further, he makes no showing that any of the exceptions to collateral estoppel apply.

However, the copy of the transcript of the preliminary hearing attached as Exhibit 4 to the Declaration of Lara Moriarty is missing pages 35 to 57, thereby preventing the Court from knowing exactly what testimony, evidence or arguments were made at the preliminary hearing that caused Derrick White to be held to answer.

The motion for summary judgment is DENIED to the extent Defendants rely on the doctrine of collateral estoppel to establish probable cause to arrest Derrick White.

The undisputed facts in this action establish that Defendants had probable cause to suspect that Derrick White had committed the robbery.  Evidence from third parties described the vehicle, including the license plate number and the location to

47

which the vehicle traveled after leaving the scene of the robbery.  That evidence, when combined with information obtained from state records, established that the vehicle was registered to Alice White at the location to which the vehicle had traveled, that Derrick White lived at the same location, that Derrick White was on parole for armed robbery, and that Derrick White's personal characteristics were similar to those of the robber relayed to police by witnesses.  Witnesses to the robbery identified Derrick White during the in-field identification. What is disputed is whether, when Defendants detained Derrick White at the apartment complex, he had money either on his person or in his apartment that could have come from the robbery; whether clothing seen at the apartment matched clothing described by the witnesses to the robbery; and whether Derrick White had been at the apartment at the time of the robbery.  The evidence from the third party witnesses more than suffices to establish probable cause to arrest Derrick White regardless of Plaintiffs' contentions about the clothes and the money.  The vehicle that was described was Plaintiffs' car.  Derrick White was identified as an occupant of that car by those witnesses.  This is sufficient to establish probable cause for Derrick's arrest as a matter of law.  That witnesses may have subsequently changed their minds does not detract from what they saw and described to the officers at the time of the incident and Derrick's arrest.

Defendants' motion for summary judgment on the issue of probable cause to arrest Derrick White is GRANTED.

48

1

          **b.   <u>Arrest of Alice White</u>.**

2        **Defendants contend that the undisputed facts set forth above**

3  **also demonstrate as a matter of law that the arrest of Alice**

4  **White for violation of California Penal Code § 12072(a)(1)**

5  **(providing a firearm to a felon) and California Penal Code §**

6  **148(a)(1)(resisting, obstructing, delaying police in their**

7  **investigation) was supported by probable cause.  Alice White**

8  **falsely told the investigating officers that Derrick White had**

9  **been at the apartment during the evening of March 15, 2004 and**

10  **had just left the apartment when he was detained.  Alice White**

11  **admitted that she knew that Derrick was a convicted felon on**

12  **parole and that he was not permitted to possess a firearm.  She**

13  **told the investigating officers conflicting stories about her**

14  **alleged acquisition of the handgun.  She also told the officers**

15  **she did not know how to operate the weapon.  She told the**

16  **officers that Derrick White did not stay in the master bedroom**

17  **where the handgun was found despite the presence of his clothing**

18  **in that bedroom.  In addition, the officers found a magazine**

19  **containing live ammunition for the same type of handgun found in**

20  **Alice White's purse in one of Derrick White's shoes.**

21        **In her opposition, Alice White denies these assertions under**

22  **penalty of perjury.  She asserts that she refused permission to**

23  **search her closed purse but that the officer searched it anyway.**

24  **She denies that she made conflicting statements to the officers**

25  **concerning the gun.**

26        **The evidence surrounding Alice White's arrest is disputed.**

The motion for summary judgment on the issue of probable cause to arrest Alice White is DENIED.

### 2. Excessive Force.

Defendants move for summary judgment with regard to Plaintiffs' claims that their respective arrests violated the Fourth Amendment's prohibition against excessive force.

All claims of excessive force are analyzed under the objective reasonableness standard of the Fourth Amendment set forth in *Graham v. Connor*, 490 U.S. 386 (1989) and *Tennessee v. Garner*, 471 U.S. 1 (1985). *Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir.2005). "Determining whether the force used to effectuate a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S at 396: This balancing test entails consideration of the totality of the facts and circumstances in the particular case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The most important of these factors is the threat posed by the suspect. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005). The "broad discretion that must be afforded to police officers who face a tense situation," must be extended to mistakes of fact concerning "the existence of probable cause" as

well as to mistakes as to what the law requires under particular circumstances.  *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396.  The "question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  *Id*. at 397. "The question is not simply whether the force was necessary to accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all* the relevant circumstances."  *Hammer v. Gross*, 932 F.2d 842, 848 (9th Cir.), *cert. denied sub nom. City of Newport Beach, Cal. v. Hammer*, 502 U.S. 980 (1991).  As explained in *Forrester v. City of San Diego*, 25 F.3d 804, 807-808 (9th Cir.1994), *cert. denied*, 513 U.S. 1152 (1995):

> Police officers ... are not required to use the least intrusive degree of force possible. Rather ..., the inquiry is whether the force used to effect a particular seizure was reasonable, viewing the facts from the perspective of a reasonable officer on the scene ... Whether officers hypothetically could have used less painful, less injurious, or more effective force in executing an arrest is simply not the issue.

The court's consideration of whether a particular use of force is reasonable "must make allowance for the fact that police officers are often forced to make split-second judgments - in

1  circumstances that are tense, uncertain, and rapidly evolving -
2  about the amount of force that is necessary in a given
3  situation", *Graham*, 490 U.S. at 396-397 (not every push or shove,
4  even if it may later seem unnecessary in hindsight violates the
5  Fourth Amendment).  Proper application of the reasonableness
6  standard "requires careful attention to the facts and
7  circumstances of each particular case, including 1) the severity
8  of the crime at issue; 2) whether the suspect poses an immediate
9  threat to the safety of the officers or others; and 3) whether he
10 is actively resisting arrest or attempting to evade arrest by
11 flight.

12       There is no evidence that Defendants used unreasonable
13 force on Derrick White in effecting his arrest and Derrick's
14 submissions do not describe any use of force, much less
15 unreasonable force, against him.  At the hearing on September 24,
16 Derrick White described force used against him during the in-
17 field identification at the apartment complex.  Derrick's
18 representations made for the first time at the September 24
19 hearing do not constitute appropriate evidence to negate summary
20 judgment on this ground.

21       Defendants' motion for summary judgment on Derrick White's
22 excessive force claim is GRANTED.

23       With regard to Alice White, in her opposition brief, she
24 asserts:

25            I was trying to ask the officers why they
             were going through my assets since I'm not on
26            parole and Officer Michael [sic] grabbed me

52

> from the stairs and threw me on the couch and
> said 'black bitch don't move'.

Although this assertion is made under penalty of perjury, no "Officer Michael" is a defendant in this action.  Attached to the Supplemental Declaration of Benjamin Ratliff is a copy of part of Alice White's deposition transcript where she is testifying in response to questions about what rights of hers she believed Officer Manfredi had violated.  Nowhere does she describe the use of force or claim that Officer Manfredi used force on her or physically harmed her in any way.

As Defendants argue, the arresting officers had to lay hands on the Plaintiffs in order to take them into custody and transport them to the 1 Bureau.  However, there is no evidence that any physical contact in effecting the arrests was unreasonable or excessive.

Defendants' motion for summary judgment with regard to Plaintiffs' claims of excessive force in violation of the Fourth Amendment is GRANTED.

### 3.  Deprivation of Due Process.

Defendants are entitled to summary judgment in connection with Plaintiffs' claims that their arrests "deprived them of their life and liberty without due process of law under the Fourteenth Amendment".  Plaintiffs' claims concerning the lawfulness of their arrests is limited to the Fourth Amendment. *See Graham v. Connor, id.,* 490 U.S. at 395.  No stand alone due process claim exists for false arrest.

1   The motion for summary judgment as to the Fourteenth

2   Amendment false arrest claim is GRANTED as to both Plaintiffs.

3   Defendants are also entitled to summary judgment in

4   connection with Plaintiffs' claims that the "unwarranted and

5   senseless arrest of plaintiff's [sic] has violated their

6   Fourteenth Amendment liberty interest in the companionship and

7   support of one another."

8   "A substantive due process claim for deprivation of the

9   right to familial companionship is recognized where the

10  deprivation is the result of 'unwarranted' governmental

11  interference. *Crowe v. County of San Diego*, 303 F.Supp.2d 1050,

12  1098 (S.D.Cal.2004). If the arrest is supported by probable

13  cause, the state's interference with familial relationships is

14  not unwarranted and the substantive due process claim necessarily

15  fails. *Id.*

16  Summary judgment as to this claim is GRANTED as to both

17  Plaintiffs.

18  Although not alleged in the Amended Complaint filed on May

19  31, 2006, Plaintiffs' oppositions quoted above assert that

20  Defendants failed to give them *Miranda* warnings. Defendants' do

21  not specifically address this claim in their reply brief.

22  Although Plaintiffs' assertions are unclear as to timing and

23  details, the failure to give *Miranda* warnings before conducting a

24  custodial interrogation may be actionable under Section 1983 as a

25  violation of substantive due process even if statements obtained

26  in violation of *Miranda* are not used in court. *See California*

54

*Attorneys for Criminal Justice v. Butts*, 195 F.3d 1039, 1045 (9th

Cir.1999), *cert. denied,* 530 U.S. 1261 (2000); *Cooper v. Dupnik*,

963 F.2d 1220 (9th Cir.), *cert. denied*, 506 U.S. 953 (1992).

However, *Cooper* cautioned that a bare violation of *Miranda* is not

enough to sustain a claim under Section 1983:

> We again stress that this case does not deal
> with a product of police interrogation that
> is just technically involuntary, or
> presumptively involuntary, as those terms are
> used in *Miranda* jurisprudence, but with a
> product that was involuntary *because it was
> actively compelled and coerced* by law-
> enforcement officers during in-custody
> questioning, as those terms are used in
> *Miranda* ... Our holding ... does not create a
> Fifth Amendment cause of action under § 1983
> for conduct there merely violates *Miranda*
> safeguards without also trespassing on the
> actual Constitutional right against self-
> incrimination those safeguards are designed
> to protect.  This case does not establish a
> cause of action where police officers
> continue to talk to a suspect after he
> asserts his rights and where they do so in a
> benign way, without coercion or tactics that
> compel him to speak.  What we do confront is
> a case laden with police misconduct that is
> 'identical with the historical practices [of
> incommunicado interrogation] at which the
> right against self-incrimination was aimed.

*Cooper*, 963 F.2d at 1244.

Plaintiffs have presented no evidence from which it may be

inferred that the alleged failure to give *Miranda* warnings even

approaches the circumstances described in *Cooper*.  Neither

Plaintiff gave any statement of consequence that resulted in

further criminal proceedings.  Summary judgment for Defendants is

GRANTED to the extent that Plaintiffs' claim of violation of the

Fourteenth Amendment is based on the alleged failure to give

*Miranda* warnings.

### 4.   <u>QUALIFIED IMMUNITY</u>.

The individual Defendants move for summary judgment on the ground of qualified immunity.

Qualified immunity serves to shield government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Supreme Court has set forth a two-pronged inquiry to resolve all qualified immunity claims. First, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officers' conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court determines that the conduct did not violate a constitutional right, the inquiry is over and the officer is entitled to qualified immunity. However, if the court determines that the conduct did violate a constitutional right, *Saucier*'s second prong requires the court to determine whether, at the time of the violation, the constitutional right was "clearly established." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. This inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id*. at 201. Even if the violated right is clearly established, *Saucier*

recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faces.  If an officer makes a mistake in applying the relevant legal doctrine, he is not precluded from claiming qualified immunity so long as the mistake is reasonable.  If "the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense."  *Id*. at 205.  In *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court reiterated:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted.  *Saucier v. Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the sometimes "hazy border between excessive and acceptable force"').  Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct.  If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the officer should not be subject to liability or, indeed, even the burdens of litigation.

> It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'  *Id*., at 201.  As we previously said in this very context:

> > '[T]here is no doubt that *Graham v. Connor, supra*, clearly establishes the general proposition that use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness.  Yet, that is not enough.  Rather, we emphasized in *Anderson* [*v. Creighton*] "that the

57

> right the official is alleged to
> have violated must have been
> 'clearly established' in a more
> particularized, and hence more
> relevant, sense: The contours of
> the right must be sufficiently
> clear that a reasonable officer
> would understand that what he is
> doing violates that right.' ...
> The relevant, dispositive inquiry
> in determining whether a right is
> clearly established is whether it
> would be clear to a reasonable
> officer that his conduct was
> unlawful in the situation he
> confronted.'  ...
>
> The Court of Appeals acknowledged this
> statement of law, but then proceeded to find
> fair warning in the general tests set out in
> *Graham* and *Garner* ... In so doing, it was
> mistaken.  *Graham* and *Garner,* following the
> lead of the Fourth Amendment's text, are cast
> at a high level of generality.  See *Graham v.
> Connor*, *supra*, at 396 ('"[T]he test of
> reasonableness under the Fourth Amendment is
> not capable of precise definition or
> mechanical application"').  Of course, in an
> obvious case, these standards can 'clearly
> establish' the answer, even without a body of
> relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom. Scarrot v. Wilkins*, 543 U.S. 811 (2004):

> Where the officers' entitlement to qualified
> immunity depends on the resolution of
> disputed issues of fact in their favor, and
> against the non-moving party, summary
> judgment is not appropriate.  *See Saucier*,
> 533 U.S. at 216 ... (Ginsberg, J.,
> concurring)('Of course, if an excessive force
> claim turns of which of two conflicting
> stories best captures what happened on the
> street, *Graham* will not permit summary
> judgment in favor of the defendant
> official.').

The motion for summary judgment on the issue of qualified immunity is DENIED with regard to Alice White's claim that her arrest was not supported by probable cause; the facts leading up to her arrest are disputed.

### 6.   LIABILITY OF CITY OF FRESNO PURSUANT TO *MONELL*.

*Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) authorizes direct suits against local government units under Section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 at 690-691. "Moreover, ... local governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.*  Since "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort[,] ... a municipality cannot be held labile solely because it employs a tortfesor - or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Id.* at 691.  A municipality will be liable under Section 1983 only if "the municipality itself causes the constitutional violation at issue." *Canton v. Harris*, 489 U.S. 378, 385 (1989).  In order to assert a *Monell* claim, plaintiff must establish: (1) a violation of constitutional rights occurred; (2) the existence of a municipal

policy or custom; and (3) a causal nexus between (1) and (2). *Canton, id.* at 385-386; *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point.").  If municipal liability is based on an alleged failure to train, the plaintiff must show that (1) he or she was deprived of a constitutional right, (2) that the municipality had a training policy that "'"amounts to deliberate indifference to the [constitutional] rights of the persons" with whom [its police officers] are likely to come into contact'"; and (3) his or her constitutional injury would have been avoided had the municipality properly trained those officers.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir.2007).

The Amended Complaint alleges in pertinent part:

> 8.  The actions of the officer's [sic] who arrested the plaintiff's [sic] were taken pursuant to a policy, pattern, practice and custom of the Fresno Police Department to arrest individuals by using excessive force.

> 9.  Despite their knowledge of this illegal policy, pattern, and custom, the supervisory and policy-making [sic] of the City of Fresno and the Fresno Police Department have taken no effective steps to terminate the policy, pattern, practice, and custom; have not effectively disciplined or otherwise properly supervised the individual officer [sic] who engaged in the policy, pattern and custom.

> 10.  Moreover the City of Fresno and the Fresno Police Department has [sic] not effectively trained the Fresno Police

Officers with regard to the proper
constitutional and statutory limits of the
exercise of their authority, in the use of
excessive force.

11.  As a direct and proximate result of the
acts, omissions, policies, patterns,
practices and customs of the defendants
alleged herein, plaintiff's [sic] have
suffered severe mental anguish and emotional
distress, and fear and depression, all to
their damage and detriment.

12.  As a direct and proximate result of the
acts, omissions, policies, patterns,
practices and customs of the defendants
alleged herein, plaintiff's [sic] have
suffered loss of consortium with each other
all to their damage and detriment.

13.  As a direct and proximate result of the
acts, omissions, policies, patterns,
practices and customs of the defendants
alleged herein, defendants' intentionally and
unlawfully exercised excessive force to
restrain, detain or confine Alice White and
Derrick White.  This restraint, detention or
confinement compelled the plaintiff's [sic]
to stay or go somewhere for some appreciable
time however short.  This caused Alice White
and Derrick White to suffer injuries, damage,
and confinement, all to their damage and
detriment.

Because Defendants are entitled to summary judgment with
respect to the alleged use of excessive force, it is not
necessary to address municipal liability under *Monell* and its
progeny.  Nonetheless, Plaintiffs present no evidence whatsoever
and make no assertions in their briefs from which it may be
inferred that the City is liable under *Monell* and its progeny.

Defendants' motion for summary judgment is GRANTED as to the
*Monell* claims as to both Plaintiffs.

E.  <u>SECOND CAUSE OF ACTION FOR ASSAULT AND BATTERY</u>.

Defendants are entitled to summary judgment with regard to this cause of action.

In order to prevail on a claim of battery against a police officer, the plaintiff bears the burden of proving the officer used unreasonable force. *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1102 (2004). The question is whether the officers' actions were objectively reasonable based on the facts and circumstances confronting them. *Id.,* at 1103.

Defendants' motion for summary judgment on the Second Cause of Action is GRANTED. Plaintiffs present no evidence that the officers used unreasonable or excessive force in effecting the arrest of either of the Plaintiffs or that any of the elements of assault or battery are established.

F. <u>THIRD CAUSE OF ACTION FOR FALSE ARREST AND IMPRISONMENT</u>.

Defendants move for summary judgment with respect to the Third Cause of Action for false arrest and imprisonment.

Pursuant to California Penal Code § 836(a), a police officer may make an arrest:

> (1) Whenever he has probable cause to believe that the person to be arrested has committed a public offense in his presence.
>
> (2) The person arrested has committed a felony, although not in the officer's presence.
>
> (3) The officer has probable cause to believe that the person to be arrested has committed a felony, whether or not the felony, in fact, has been committed.

Here, Defendants argue they are entitled to summary judgment on

Plaintiffs' respective claims that their arrests were not supported by probable cause in violation of the Fourth Amendment. *See discussion supra.*

In California, the elements of false imprisonment are: (1) the nonconsensual, intentional confinement of a person, (2) without lawful privilege, and (3) for an appreciable period of time, however brief. *Blaxland v. Commonwealth Director of Public Prosecutions,* 323 F.3d 1198, 1205 (9th Cir.2003).

Here, Defendants contend, because Plaintiffs' arrests were supported by probable cause, Defendants are entitled to summary judgment. *See Halpern v. City of Santa Cruz*, 2006 WL 1208118 (9th Cir.2006). *See discussion supra.*

Defendants' motion for summary judgment on the Third Cause of Action is DENIED as to Alice White and GRANTED as to Derrick White.

G.   FOURTH CAUSE OF ACTION FOR NEGLIGENCE AND FIFTH CAUSE OF ACTION FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS.

Defendants contend they are entitled to summary judgment with respect to the Fourth Cause of Action for Negligence and the Fifth Cause of Action for negligent infliction of emotional distress.

The Fourth Cause of Action alleges in pertinent part:

> 26.  Defendants' [sic] were negligent in performing their duties and failed, neglected, and/or refused to properly and fully discharge their responsibility by, among other things. [sic]
>
> A.   The unlawful arrest of

plaintiff's [sic];

B.  Improper field line up;

C.  Failing to devote a reasonable
and sufficient amount of time and
service to training and supervising
the individual officer who used
excessive force regarding the
arrest of plaintiff's [sic].

Under California law, a claim for negligent infliction of emotional distress is in substance a claim for negligence.  The elements of any negligence cause of action are duty, breach of duty, proximate cause and damages.  *Artiglio v. Corning, Inc.*, 18 Cal.4th 604, 614 (1998).

Defendants contend that they did not breach their duty of care to Plaintiffs for the reasons discussed in relation to their constitutional claims.

Defendant officers further contend that, even if they did breach a duty of care to either Plaintiff, they are immune from liability pursuant to California Government Code § 820.2, which provides:

Except as otherwise provided by statute, a
public employee is not liable for an injury
resulting from his act or omission where the
act or omission was the result of the
exercise of discretion vested in him, whether
or not such discretion be abused.

Defendants cite *Morgan v. County of Yuba*, 230 Cal.App.2d 938, 942 (1964): "A discretionary act is one which requires 'personal deliberation, decision, and judgment ....'"

However, as explained in *Gillian v. City of San Marino*, 147 Cal.App.4th 1033, 1051 (2003):

64

> ... The immunity does not apply to all acts by public employees within the literal meaning of the term 'discretionary.'  Rather, the immunity is more limited ....
>
> '[A] "workable definition" of immune discretionary acts draws the line between "planning" and "operational" functions of government ... Immunity is reserved for those "*basic policy decisions* [which have] ... been [expressly] committed to coordinate branches of government," and as to which judicial interference would thus be "unseemly." ... Such "areas of quasi-legislative policy-making ... are sufficiently sensitive" ... to call for judicial abstention from interference that "might even in the first instance affect the coordinate body's decision-making process ...' ....
>
> The decision to arrest Gillian was not a basic policy decision, but only an operational decision by the police purporting to apply the law.  The immunity provided by Government Code section 820.2 therefore does not apply.

Summary judgment for the individual Defendants on the Fourth Cause of Action is DENIED as to Alice White.  The motion for summary judgment on the Fourth Cause of Action is GRANTED as to Derrick White as no duty was breached by any defendant in effecting his arrest.

With regard to Defendant City of Fresno, direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care.  *Munoz v. City of Union City, supra*, 120 Cal.App.4th at 1112-1113.  At issue in *Munoz* were allegations against Union City based on negligence in the selection, training, retention, supervision and discipline of police

1  officers.   The Court of Appeal concluded that the direct

2  negligence theory was not grounded upon a violation of a

3  statutory duty by Union City.   *Id.*

4       Summary judgment for the City of Fresno is GRANTED.

5       Defendants' motion for summary judgment as to the Fifth

6  Cause of Action for negligent infliction of emotional distress is

7  GRANTED as to both Plaintiffs.   There is no separate tort of

8  negligent infliction of emotional distress.   *See Potter v.*

9  *Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 984-985 (1991).

10 Moreover, to the extent that Alice White has a valid claim for

11 violation of the Fourth Amendment based on false arrest,

12 emotional distress damages are available if found.

13      H.   <u>PRAYER FOR PUNITIVE DAMAGES</u>.

14      The City of Fresno is entitled to summary judgment with

15 regard to Plaintiffs' prayer for punitive damages.   A municipal

16 entity is immune from punitive damages under 42 U.S.C. § 1983.

17 *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981).

18 California Government Code § 818 provides:

19          Notwithstanding any other provision of law, a
            public entity is not liable for damages
20          awarded under Section 3294 of the Civil Code
            or other damages imposed primarily for the
21          sake of example and by way of punishing the
            defendant.
22
23      The individually named Defendants seek summary judgment with

   regard to Plaintiffs' prayer for punitive damages.
24
        "[A] jury may be permitted to assess punitive damages in an
25
   action under § 1983 when the defendant's conduct is shown to be
26

motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."  *Smith v. Wade*, 461 U.S. 30, 56 (1983).  To recover punitive damages pursuant to California Civil Code § 3294(a), the Plaintiffs must establish by clear and convincing evidence that the Defendants acted with oppression, fraud, or malice.  *Brandon v. Rite Aid Corp., Inc.,* 408 F.Supp.2d 964, 981 (E.D.Cal.2006). This higher standard of proof applies at all stages of the proceeding, including at summary judgment.  *Id.*

The individual Defendants argue that there are no facts or evidence in this action from which these standards may be satisfied.

Summary judgment on the issue of punitive damages is DENIED as to Alice White, this is an issue of fact for the jury. Summary judgment is GRANTED on the issue of punitive damages as to DERRICK WHITE.

<u>CONCLUSION</u>

For the reasons stated above:

1.  Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART:

a.  Summary judgment is GRANTED as to Defendant City of Fresno as to all claims;

b.  Summary judgment is GRANTED for Defendants as to all the claims of DERRICK WHITE for excessive force in violation of the Fourth Amendment, false arrest in violation of the Fourth Amendment, false arrest in violation of the Fourteenth Amendment,

violation of due process, assault and battery, negligence, negligent infliction of emotional distress, and damages of any kind.  Judgment for Defendants will be entered against Derrick White in Nos. CV-F-05-1564 and CV-F-05-1558.

       c.  Summary judgment is GRANTED for Defendants as to the claim of Alice White for excessive force in violation of the Fourth Amendment, false arrest in violation of the Fourteenth Amendment, due process, denial of familial association, and assault and battery.

       d.  Summary judgment is DENIED with respect to Alice White's claim of arrest without probable cause in violation of the Fourth Amendment, Defendants' claims of qualified immunity from liability under 42 U.S.C. § 1983, negligence as to Alice White, and punitive damages as to Alice White.

   2.  Counsel for Defendants shall prepare and lodge a form of order that the rulings set forth in this Memorandum Decision within five (5) days following the date of service of this decision.

   3.  A further status conference involving counsel for Defendants and Alice White for trial setting will be scheduled by the Court.

   IT IS SO ORDERED.

Dated:   __November 9, 2007__         _____/s/ Oliver W. Wanger_____
                                    UNITED STATES DISTRICT JUDGE